**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 13 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOHN MELVIN ALEXANDER;
JUANITA DELORES BURNETT
ARNOLD; J. B. BATES; ESSIE LEE
JOHNSON BECK; JAMES D. BELL;
PHINES BELL; FRANCES
BLACKWELL; JUANITA WILLIAMS
BLAKELY; JUANITA SMITH
BOOKER; KINNEY BOOKER;
DOROTHY BOOKER BOULDING;
JEANETTE MCNEAL BRADSHAW;
TERESA EARLEE BRIDGES
DYSART; JOHNNIE L. GRAYSON
BROWN; LEE ELLA STROZIER
BROWN; CLARENCE BRUNER;
LULA BELLE LACY BULLOCK; JOE
R. BURNS; ROSE L. GREEN BYNUM;
MURIEL MIGNON LILLY CABELL;
BEATRICE
CAMPBELL-WEBSTER; JAMES
DALE CARTER; ROSELLA CARTER;
SAMUEL CASSIUS; NAOMI
HOOKER CHAMBERLAIN;
MILDRED MITCHELL
CHRISTOPHER; MILDRED LUCAS
CLARK; OTIS GRANVILLE CLARK;
SANDY CLARK; BLANCHE
CHATMAN COLE; WORDIE
"PEACHES" MILLER COOPER;
CARRIE HUMPHREY CUDJOE;
LAVERNE COOKSEY DAVIS;
DOLLY MAE DAUFITT; JAMES
DURANT; LUCILLE B. BUCHANAN
FIGURES; ARCHIE JACKSON
FRANKLIN; JIMMIE LILLY

No. 04-5042

FRANKLIN; JOAN HILL GAMBREL; EARNESTINE GIBBS; HAROLD GIBBS; THERESSA CORNELLA MCNEAL GILLIAM; EDWARD L. GIVENS; BERTHA GUYTON; HAZEL FRANKLIN HACKETT; MILDRED JOHNSON HALL; NELL HAMILTON HAMPTON; LEROY LEON HATCHER; MADELEINE HAYNES; JOYCE WALKER HILL; ROBERT HOLLOWAY; DR. OLIVIA J. HOOKER; SAMUEL L. HOOKER, JR.; WILHELMINA GUESS HOWELL; CHARLES HUGHES; MYRTLE WELLS HURD; VERA INGRAM; EUNICE CLOMAN JACKSON; GENEVIEVE ELIZABETH TILLMAN JACKSON; WILLIE BELL WHITE JACKSON; DR. HOBART JARRETT; ARTIE LACY JOHNSON; WILMA MITCHELL JOHNSON; EDWARD EARVEN JONES; HAZEL DOLORES SMITH JONES; JULIA BONTON JONES; PERCY JONES; THELMA THURMAN KNIGHT; LEANNA JOHNSON LEWIS; KATIE MAE JOHNSON LIVINGSTON; ALICE HIGGS LOLLIS; ROANNA HENRY MCCLURE; ELDORIS MAE ECTOR MCCONDICHIE; CAROL SMITHERMAN MARTIN; MARY TACOMA MAUPIN; WILLIE MUSGROVE MEANS; ISHMAEL S. MORAN; RUTH DEAN NASH; SIMEON L. NEAL; ALMADGE J. NEWKIRK; MYRTLE NAPIER OLIVER; JUANITA MAXINE SCOTT PARRY; IDA BURNS PATTERSON; FREDDIE SCOTT PAYNE; JUNE

ALEXANDERPOWDRILL; ALICE PRESLEY; DELOIS VADEN RAMSEY; CORA HAWKINS RENFRO; SIMON R. RICHARDSON; JEWEL SMITHERMAN ROGERS; GERLINE HELEN WRIGHT SAYLES; JULIUS WARREN SCOTT; WILLIAM A. SCOTT; TULETA S. DUNCAN SHAWNEE; VENEICE DUNN SIMMS; HAL "CORNBRED" SINGER; NAOMI SIPLIN; BEULAH LOREE KEENAN SMITH; GOLDEN WILLIAMS SMITH; LOLA SNEED SNOWDEN; JAMES L. STEWARD; DOROTHY WILSON STRICKLAND; SARAH TATUM; LOIS WHITE TAYLOR; WILLIE MAE SHELBURN THOMPSON; EFFIE LEE SPEARS TODD; MELVIN C. TODD; KATHRYN MAE TAYLOR TOLIN; BESSIE MAE AUSTIN VESTER; QUEEN ESTHER LOVE WALKER; SAMUEL WALKER; TROY SIDNEY WALKER; OSCAR DOUGLAS WASHINGTON; MARY LEON BROWN WATSON; ALLEN MATTHEW WHITE; CECIL WHITE; MARIE WHITEHORN; MILDRED EVITT WILBURN; BERTRAM C. WILLIAMS; LOUIE BARTON WILLIAMS; WILLIAM HAROLD WOODS; CLOTIE LEWIS WRIGHT; WESS YOUNG; DONNA ADAMS; JOHNETTA ADAMS; THOMAS ADAMS, JR.; C. J. ALEXANDER; GEORGE ALEXANDER; LILLIAN ALEXANDER; BRENDA NAILS ALFORD; BETTY ANDERSON; RHONDA ANDERSON; ROBERT EARL ANDERSON; IRMA THOMAS

ANTHONY; LEONA JERRYE BRUNER ANTHONY; MARY BELL ARRINGTON; ARVEN AUTRY; ELMER AUTRY; JAMES AUTRY; OTIS AUTRY, JR.; RUTH ELLA AUTRY; MARGUERITE BAGBY; JOHN BAILEY; NICHOLAS A. BANKS; EDITH MCALESTER BARNES; LESLIE BEARD; RAYMOND BEARD, SR.; AUDELE MCCLEOD BEEKS; R. G. BELL; WILMA PRESLEY BELL; SIMON BERRY JR.; REV. BRADFORD BISHOP; EUGENE BOLTON; JAMES BOLTON; OSCAR BOYD; DOROTHY WILLIAMS BRANLETT; DOROTHY JACKSON BREWER; PATRICIA DUKES BROME; NAOMI LAWSON BROWN; WILLIAM BRUNER; BRENDA FAIR CAMPBELL; HENRY CANNON; NATHANIEL CANNON; EDWINA WALKER CARR; BERNARD CARTER; EDDIE HUE CARTER; ROBERT CARTER, JR.; SAMUEL LEE CARTER; ELIZABETH COOLEY CHAPPELLE; ANITA WILLIAMS CHRISTOPHER; VASSIE CLARK; AILEEN JOANNE AUSTIN COBURN; MARILYN KAY JOHNSON COLEY; ERLINE CROSSLIN; BERNICE E. BANKS DAVIS; FRED DAVIS; ROY DAVIS; LAWRENCE HERMAN DENNIE; EVELYN DIGGS; ROBERT CHARLES DUKES; WILLIE DUKES; RITA DUNCAN; ROGER DUNCAN; SYLVIA A. DUNN; AMY GAMBLE EIDSON; MARY L. EMERSON; BILL EWING; JO ANN EWING; ROBERT EWING; JANET FAIR; STANLEY FAIR, JR.; WILBUR

FOSTER; ALFREDA O. DENNIE FRANKLIN; JOHN HOPE FRANKLIN; JEAN FREENY; THELMA KINLAW GERMANY; MARGARET JEAN TILLEY GIBBS; BOBBYE LOUISE GILBERT; JEANNE OSBY GOODWIN; LINDA EDMONDSON GRAVES; ALBERT GRAYSON; KATHERINE WOOD HALE; LEONTYNE THOMAS HARRELL; DELORES HARRINGTON; MARY PRISCILLA PARKER HARRISON; JEANETTE HAWKINS; OLANDER HAWKINS; STARLA HAWKINS; JOBIE ELIZABETH HOLDERNESS; MAYBELLINE PRESLEY HOOKS; JUANITA ALEXANDER HOPKINS; SHARON HOPKINS; EMMA LOCKARD HORN; MAXIMILLIAN HOWELL; MIDLRED WALLACE HUSPETH; HELEN SIPUEL HUGGINS; CLARENCE JACKSON; DELLA SHELTON JACKSON; GAIL JACKSON; GENIEIVE JACKSON; ROSIE LEE JACKSON; SAYYID JAMI; ARTHUR JEFFERSON; LULA MAE JEFFERSON; MATTHEW JEFFERSON; ROBERT JEFFERSON; GERALDINE FAIR JESSIE; CAROLYN PRICE JOHNSON; FELICIA MCLEOD JOHNSON; JOANN JOHNSON; RONALD WAYNE JOHNSON; VAL GENE JOHNSON, SR.; DOROTHY JONES; EVA MAE TILLEY JONES; MELVIN "TIP" JONES; MILDREN PRESLEY KAVANAUGH; VERNELL KELLEY; BEVERLY NAILS KELLY; LORELL KIRK; FRANCINE JOHNSON KNAPPER; JAMES BERNARD

KNIGHTEN; MAXINE JACKSON LACY; SANDRA JEAN DAVIS LANDRUM; CAESAR LATIMER; CHARLES SYLVESTER LATIMER; HAZEL LATIMER; JAMES HAROLD LATIMER; JAYPHEE LATIMER; LISA LATIMER; PATRICE LATIMER; BURNECE LAWLER; EDWARD LAWSON; JOHNNYE CANNON LAWSON; MARCUS LAWSON; MARGARET ANN LAWSON; PALMER LAWSON, JR.; GLENDA LEBEAUX; MARGARET LEE; NORMA JEAN DENNIE LESHIE; JIMMIE LEWIS; JOE LEWIS; LORRAINE LEWIS; CORTEZ LOCKARD; EDWARD LOCKARD; ERNEST LOCKARD; FRANK LOCKARD; JESSIE MAE LOCKARD; OSCAR LOCKARD; SELMA LOCKARD; MARY LOUPE; CATHERINE MARTIN; FELTON MARTIN; JAMES PRESTON MARTIN; NANCY MARTIN; FAYE MAY; SARAH CURVAY MAYSHAW; LEONA AUSTIN MCCAIN; PAULINE MCCANTS; DENISE MCCRAY; OTIS MCCRAY, III; LORRAINE MCFARLAND; JEAN WILLIAMS MCGILL; DONALD JOHN MCGOWAN; WALLACE MCLEOD, JR.; BETTY PRESLEY MCMILLAN; LADAWNA MILLER; MILDRED MARIAN HAMEL MILLER; PEGGY ANN MCRUFFIN MITCHELL; OVETA MIXON; ELIZABETH PRESLEY MONDAY; PAT GALBRAITH MOORE; RONALD EARL MOORE; EVA GAMBLE MORRIS; CLARINDA NAILS; TERRY

NASH; EARTHA MCALESTER NORMAN; MATTIE DAVIS OLIVER; LAVADA LOUISE PARKER OSBOURNE; AUDREY BANKS PARSON; JOHN W. PATTON; LENA MAE JOHNSON PAYNE; JULIUS PEGUES; GERALDINE PERRYMAN-TEASE; WANDA EWING POPE; ESCO PORTERFIELD; MARK PORTERFIELD; JILL ELIZABETH PRESLEY; JOYCE MARIE PRESLEY; LISA PRESLEY; RAYMOND PRESLEY; RONALD DEAN PRESLEY; FLOYD PRICE; JANE FAIR PRUETT; MARCIA WALKER PUCKETT; JOYCE RAMSEY; ALLENE KNIGHTEN RAYFORD; MAE ETTA REYNOLDS; SHIRLEY RIDLEY; PATSY ROBINSON; FRANK EUGENE RODGERS; ERIC ROLLERSON; LEON ROLLERSON; WILA ROLLERSON; YVONNE ROLLERSON; JANICE LOU JOHNSON ROSS; BILLIE WAYNE RUCKER; J. C. RUCKER; ROBERT C. RUCKER; BOBBIE JEAN SAULET; MILDRED LOUISE DAVIS SCOTT; THERESA DAVIS SCOTT; YVONNE FAIR SHAW; BILLY SHELTON; DIANA LYNN SHELTON; JOHNNY SHELTON; MAIME SHELTON; SHIRLEY SHELTON; EUNA VANN SMITH; FRED SMITH; HARRIET ADAMS SMITH; ORA SMITH; CLAUDIA MAUDE SMITHERMAN; CATHRYN BELL SNODDY; BETTY SPEARS; DIANE ANDERSON STEELE; PATRICIA MCLEOD STEPHENSON; LAUREL STRADFORD; ROSA STRIPLIN;

CARRIE M. MCDONALD
STROTHER; MARTHA MCGLORIE
SWINDALL; AUDREY TAYLOR;
BYRON TAYLOR; BOBBIE JEAN
CARTER TENNYSON; SYLVESTER
TERRY, JR.; MARGARET THARPE;
JERRY FIELDS THOMAS; JESSIE
THOMAS; ERMA SMITH
THOMPSON; PANSY TILLEY;
CLIFTON JOE TIPTON; ROSEZELLA
TURNER; SHIRLEY A. JOHNSON
TYUS; MAXINE JESSIE VADEN;
LORENZO CARLOS VANN; ALICE
BOYD VAUGHN; FANNIE SMITH
VERNER; PAMELA VINSON;
MARIETTA ANDERSON WAITERS;
DENETTE MARIA WALKER; FRANK
WALKER, SR.; HARRY DANIEL
WALKER; HARVEY LEON
WALKER; RILEY WALKER, JR.;
WILLIAM D. WALKER; MARGE
WALLACE; MAYBELLE WALLACE;
MILDRED CANNON WALLACE;
SYLVIA WARE; OLENE WALKER
WASHINGTON; JIMMIE WICKAM;
YVONNE WILEY-WEBB;
CHARLOTTE WILLIAMS; DAVID
WILLIAMS; FANNIE WILLIAMS;
GRANT WILLIAMS; PATRICIA
WILLIAMS; IDA LOUISE DENNIE
WILLIS; ANNIE ALEXANDER
WILSON; BERTHA WILSON;
BOBBIE WILSON; ELIZABETH
WILSON; MARY A. WILSON;
NAOMI NASH WILLIAMS
WIMBERLY; RAMONA DINKINS
WIMBERLY; EDNA EARLY WORKS;
CHARLOTTE WRIGHT,

Plaintiffs - Appellants,

v.

THE STATE OF OKLAHOMA; THE
CITY OF TULSA; THE CHIEF OF
POLICE OF THE CITY OF TULSA, in
his official capacity; THE CITY OF
TULSA POLICE DEPARTMENT;
DOES 1 thru 100, inclusive,

        Defendants - Appellees.

---

Before **TACHA**, Chief Circuit Judge, **BARRETT**, Senior Circuit Judge**, SEYMOUR, EBEL, KELLY, HENRY, BRISCOE, LUCERO, MURPHY, HARTZ, O'BRIEN, MCCONNELL** and **TYMKOVICH,** Circuit Judges.

---

**ORDER**

---

The appellants' petition for rehearing is denied by the panel that rendered the decision.

The suggestion for rehearing en banc was transmitted to all of the judges of the court who are in regular active service. A poll was requested and a majority of the active judges voted to deny rehearing en banc. Judges Seymour, Henry, Lucero, and Hartz voted to grant rehearing. Judge Lucero filed a dissent from the denial of rehearing en

- 9 -

banc, and he was joined in this dissent by Judge Seymour.

Entered for the Court,
PATRICK FISHER


Clerk of Court

Dissent from the denial of en banc review.
04-5042, Alexander v. State of Oklahoma

**LUCERO**, Circuit Judge, dissenting, with whom **SEYMOUR**, Circuit Judge, joins.

No case in my tenure on the court could be more compellingly described as meeting the Rule 35 en banc standard of presenting a "question of exceptional importance" deserving the attention of the entire court than this. In one of the more shameful events in our nation's history, over two hundred African-Americans were slaughtered and a whole section of the City of Tulsa was burned in an uncontrolled riot in 1921. Official government action by the City of Tulsa and the State of Oklahoma fueled this carnage by deputizing and arming the mob, and authorizing the National Guard to detain the victims while their forty-two square block community was razed to the ground. (It is inconceivable that a government investigation of the incident of September 11 would have failed to count every person who perished, yet telling of the attitude that prevailed in Oklahoma in 1921 is that no effort was made to determine officially the number of those who died there.) All subsequent claims raised by the victims fell upon the deaf ears of the courts at the time, and most languished without even a cursory glance at the merits. None of the over one hundred lawsuits filed were successful. In a perversion of justice, a grand jury commissioned by the state exonerated the city and state, and all white rioters, and blamed the victims for the atrocity. This history alone raises a "question of exceptional importance" – the laudable recent investigation of this tragedy by the State of Oklahoma compels us to confront it.

But exceptional importance alone is not the sole Rule 35 basis which requires en banc review. Victims of the Riot, who were children at the time of the incident, and descendants of victims constitute the plaintiffs in this case. They seek equitable tolling of the statute of limitations. The trial court abused its discretion by dismissing the plaintiffs' complaint to the prejudice of a jury determination, in that it correctly concluded that the plaintiffs had been deprived of an impartial forum adequate to vindicate their rights, while incorrectly finding that equitable tolling had lifted at some unspecified point in the past.[1] The trial court answered the wrong question by asking whether the exceptional circumstances had changed. Rather, it should have asked whether the plaintiffs had pled a sufficient evidentiary basis – construed in the light most favorable to them – to raise a question of fact for resolution by a jury about whether the exceptional circumstances persisted.

For the reasons I state below it is my considered judgment that en banc review of this case is warranted, and I therefore respectfully dissent from the court's denial of en banc review.

## Background

In 1997 the Oklahoma legislature originated the 1921 Tulsa Race Riot Commission in order to examine officially the circumstances surrounding the Riot and its

---

[1] We review a district court's application of equitable tolling principles for abuse of discretion. Garrett v. Fleming, 362 F.3d 692, 695 (10th Cir. 2004).

after-effects and to make recommendations to the governor and the state legislature.  In its "Final Report," published on February 28, 2001, the Commission outlined the evidence it developed, which included:

> records and papers long presumed lost, if their existence had been known at all.  Some were official documents, pulled together and packed away years earlier.  Uncovered and examined, they took the commission back in time, back to the years just before and just after 1921.  Some were musty legal records saved from the shredders.  Briefs filed, dockets set, law suits decided – each opened an avenue into another corner of history.  Pages after pages laid open the city commission's deliberations and decisions as they affected the Greenwood area.

"Final Report of the Oklahoma Commission to Study the Tulsa Race Riot of 1921" ("Report") at 4.

These reports led the Commission to state that "[w]hat happened in Tulsa stays as important and remains as unresolved today as in 1921.  What happened there still exerts its power over people who never lived in Tulsa at all," id., and that the "commission's work and the documentary record it leaves behind shines upon [the Riot] a light too bright to ignore." Id. at 6.  In describing the attitudes that prevailed at the time, the Commission concluded:

> The intent was to intimidate one community . . . . These are the qualities that place what happened in Tulsa outside the realm of the law –  and not just in Tulsa, either.  Lexington, Sapulpa, Norman, Shawnee, Lawton, Claremore, Perry; Waurika, Dewey, and Marshall – earlier purges in every one had targeted entire black communities, marking every child, woman, and man for exile. . . . [A] collective body – acting as

- 3 -

one body – had coldly and deliberately and systematically assaulted one victim, a whole community, intending to eliminate it as a community. If other black communities heard about it and learned their lessons, too, so much the better; a little intimidation went a long way. . . . Here were discrete acts – one act, one town – each consciously calculated to have a collective effect not against a person but against a people. . . . [T]he one purpose was to keep one race "in its place."

Id. at 16-17. The Commission asked:

Who sent the message? Not one person but many acting as one. Not a "mob;" it took forms too calculated and rational for that word. . . . [I]t really was not "Oklahoma" either. At least, it was not all of Oklahoma. It was just one Oklahoma, one Oklahoma that is distinguishable from another Oklahoma partly by purpose. This Oklahoma had the purpose of keeping the other Oklahoma in its place, and that place was subordinate. That, after all, was the object of suffrage requirements and segregation laws. No less was it the intent behind riots and lynchings, too. One Oklahoma was putting the other Oklahoma in its place. . . . Government was never the essence of that Oklahoma. Government was, however, always its potential instrument. Having access to government, however employed, if employed at all – just having it – defined this Oklahoma and was the essence of its power.

Id. at 19.

In describing the various assaults on the African-American community, and in a resounding denunciation of the system that prevailed in the aftermath of the Riot, the Commission stated "[i]n some government participated in the deed. In some government performed the deed. In none did government prevent the deed. In none did government punish the deed." Id.

Equitable Tolling of the Statute of Limitations

This case is not about tolling, it is about equitable tolling.  Plaintiffs sued the State of Oklahoma, the City of Tulsa, and others under, inter alia, §§ 1981, 1983, and 1985 for damages they sustained in the Riot.  Rejecting their equitable tolling arguments, the district court dismissed the plaintiffs' suit on statute of limitations grounds.  The panel affirmed.

On the basis of the overwhelming force of the Commission's report, the panel correctly concluded that at the time of the Riot the victims were denied meaningful ability to gain restitution in the courts.  Nonetheless, the panel affirmed the district court's finding that at some unspecified point, prior to February 2001, the extraordinary circumstances that justified equitable tolling the statute of limitations had abated.  This is the error upon which I dissent.

We have previously concluded that exceptional circumstances may justify equitable tolling of a statute of limitations.  See, e.g., Van Tu v. Koster, 364 F.3d 1196, 1199-1200 (10th Cir. 2004).  Generally, courts have tolled the statute of limitation when plaintiffs' failure to file their claims within the statutory period is excused by the defendant's misconduct.  See Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996) (holding that fear of reprisal was extraordinary circumstance justifying equitable tolling on Philippine nationals' claims against the Estate of Fedinand Marcos for injuries arising from torture and summary execution); Hobson v. Wilson, 737 F.2d 1, 37 (D.C. Cir. 1984)

(tolling statute because the FBI's concealment of its COINTELPRO activities blinded plaintiffs to their potential cause of action); <u>Rosner v. United States</u>, 231 F.Supp. 2d 1202 (S.D. Fla. 2002) (taking as true plaintiffs' allegations that the United States wrongfully claimed that property it seized from the Nazis taken from Hungarian Jews was unidentifiable and unreturnable, the court equitably tolled the statute); <u>Thompson v. Metropolitan Life Ins. Co.</u>, 149 F. Supp. 2d 38 (S.D.N.Y. 2001) (tolling statute on African-American plaintiffs claims against defendant insurance companies for pattern of intentional discrimination in sales of insurance policies from the late 1800s through the 1970s); <u>Bodner v. Banque Paribas</u>, 114 F. Supp. 2d 117, 136 (E.D.N.Y. 2000) (finding on claims by Jewish plaintiffs against various banks seeking restitution of money and property that "[t]here is no reason that plaintiffs should be denied a forum for addressing their claims as a result of deceitful practices by the defendants which have kept them from knowing or proving the extent of these claims").

In the matter before us, plaintiffs argue that a combination of at least four factors summarized as follows warrant equitable tolling: (1) an openly hostile racial environment, (2) denial of responsibility by governmental officials, (3) the grand jury's exoneration of white rioters, and (4) the grand jury's indictment of African-American victims. Concluding that the openly hostile racial environment substantially changed well before February 2001, the district court found that exceptional circumstances did not support tolling the statute of limitations to that date. On appeal, the panel endorsed the court's

reasoning and affirmed. Both the district court and the panel erroneously disregarded the other three grounds alleged by the plaintiffs as constituting, in combination, exceptional circumstances. Each of those grounds clearly persisted until the filing of the Commission Report.

Our decision in <u>Van Tu</u> implies that on a motion to dismiss based on the statute of limitations, the district court must determine with reference to the facts before it, construed in the light most favorable to the plaintiffs, whether the exceptional circumstances justifying the tolling of the statute of limitations persisted long enough to render the complaint timely filed. Of course, if there is a dispute of facts on the point, such fact determinations should be made by a jury, not by the court or the panel. <u>Redwine v. Baptist Med. Ctr of Okla., Inc.</u>, 679 P.2d 1293, 1295 (Okla. 1983) ("the beginning of the running of the statute of limitations is usually to be determined from the facts and circumstances of the particular case; and, where these are such that reasonable men might reach conflicting opinions thereon, the issue is a question for determination by the trier of the facts"). The Report, which was before the district court, amply demonstrates that issues of material fact exist as to whether at least three circumstances alleged by the plaintiffs persisted until February 2001, namely the denial of responsibility by the government, the grand jury's exculpation of the white rioters, and the grand jury's indictment of the Riot's victims. These factors, taken in combination, constitute exceptional circumstances because any attempt the victims could have made to seek

restitution prior to the Report would necessarily have occurred in the shadow of numerous official pronouncements denying culpability. Only after the Commission issued the Report revealing the government's responsibility and exonerating the African-American community did the context change and allow the victims a fair opportunity to seek justice.

However, the panel suggests that publication of Scott Ellsworth's book, Death in a Promised Land, in the early 1980s, which contained some of the facts included in the Commission's Report, at the very latest, would have stopped the equitable tolling. This argument misconstrues the heart of plaintiffs' claim. Plaintiffs do not argue that they were unaware of the facts, their claim is that the continued renunciation of government culpability by those in power created an impenetrable barrier to justice. In any event, whether the 1982 publication trumps an equitable claim is properly a question for a fact finder.

Finding "extraordinary circumstances in a legal system that was openly hostile to [the plaintiffs], courts that were practically closed to their claims, a City that blamed them for the Riot and actively suppressed the facts, an era of Klan domination of the courts and police force, and the era of Jim Crow," the district court determined that "[t]here is no question that there are exceptional circumstances here" sufficient to conclude that "[t]he political and social climate after the riot simply was not one wherein the Plaintiffs had a true opportunity to pursue their legal rights." Alexander v. Oklahoma, No. 03-C-133-E, 2004 U.S. Dist. LEXIS 5131, *30-31 (N.D. Okla. 2004). Notably, the district court

- 8 -

summarily concluded that "there is no credible allegation that any of [these] exceptional circumstances continued until the Commission Report was published." Id. at *32. This conclusion flies in the face of the Oklahoma state legislature's finding that the Tulsa Race Riot "was virtually forgotten," but "The 1921 Tulsa Race Riot Commission has forever ended the 'conspiracy of silence' surrounding the events in Tulsa of May 31-June 1, 1921, and their aftermath." Okla. Stat. tit. 74, § 8000.1. In adopting the Commission's Report, the state legislature for the first time "freely acknowledge[d] its moral responsibility on behalf of the state of Oklahoma and its citizens" for subordinating African-Americans. Id. The legislature also pronounced that "[o]fficial reports and accounts of the time that viewed the Tulsa Race Riot as a 'Negro uprising' were incorrect." Id.

Given the plaintiffs' allegations that the poisonous atmosphere created by the official denials of government culpability and official pronouncements that the African-American community was to blame would have fatally tainted any lawsuit, and that the Commission Report constituted the first and only official reversal of those positions, the district court abused its discretion by so tersely disregarding the plaintiffs' arguments. Rather, the court should have viewed the evidence in the light most favorable to the plaintiffs and submitted to a jury the question of whether the exceptional circumstances persisted until publication of the Report. Compounding this error, the panel affirmed the district court's finding by concluding that "evidence suggesting the City and State's

involvement in the Riot was available in its immediate aftermath and, at the very least, upon publication of Death In A Promised Land in 1982." Alexander v. Oklahoma, 382 F.3d 1206, 1219 (10th Cir. 2004). Stating that facts were available demonstrating government culpability does not respond to the plaintiffs' argument that denial of responsibility by governmental officials, the grand jury's exoneration of white rioters, and the grand jury's indictment of African-American victims created an official barrier to justice, which constitutes an extraordinary circumstance that persisted until the Commission filed its report.

Given the district court's indefiniteness regarding when equitable tolling was no longer appropriate, I suspect that there is no time when social conditions would have been different for the plaintiffs – no time when, on the court's reasoning, they could have brought their claim. That is, the court could always point to some earlier time when plaintiffs should have brought their claims – e.g., the naming of the Commission, the publication of Ellsworth's book, the passage of civil rights legislation, the decision in Brown v. Board of Education – all the way back in time until the racist conditions underlying the claim for equitable tolling would have foreclosed any such claims. Our equitable duties require more from us than to place plaintiffs in such an untenable position.

Furthermore, with regard to plaintiffs' claims of equitable tolling on the basis of fraudulent concealment, the district court and the panel both correctly note that in

Oklahoma the statute is tolled when a defendant commits "some actual artifice to prevent knowledge or some affirmative act of concealment or some misrepresentation to exclude suspicion and prevent inquiry." Wills v. Black & West, Architects, 344 P.2d 581, 584 (Okla. 1959); Jarvis v. City of Stillwater, 732 P.2d 470, 472-73 (Okla. 1987). Recognizing that both a discovery rule and the doctrine of fraudulent concealment are exceptions to the running of a statute of limitations, the district court and the panel focus only on the issue of what information plaintiffs reasonably had available prior to 2001, essentially focusing only on the discovery rule that tolls the limitations period "until an injured party knows of, or in the exercise of reasonable diligence, should have known of or discovered the injury." Lovelace v. Keohane, 831 P.2d 624, 629 (Okla. 1992).

Although it is certain that the plaintiffs were aware of their injuries from the date they occurred, it is also equally certain that the city and state concealed their role in the Riot, as the district court correctly observes, "through the convening of a Grand Jury that blamed the Riot on the victims, the failure to investigate the riot or prosecute persons who committed murder or arson, and the disappearance of official files from the Oklahoma National Guard, the County Sheriff, and the Tulsa Police Department." Alexander v. Oklahoma, 2004 U.S. Dist. LEXIS 5131, at *23. The panel nonetheless affirmed the district court's finding that the defendants' concealment did not bar plaintiffs' ability to discover "essential information" about their claims. But this finding bypasses the plaintiffs' argument that the fact of admission of responsibility and the fact of

renunciation of the grand jury findings were not present until 2001. Even if under Oklahoma law, "[o]ne relying on fraudulent concealment to toll the statute of limitation must not only show that he did not know facts constituting a cause of action, but that he exercised reasonable diligence to ascertain such facts," Funnell v. Jones, 737 P.2d 105, 107 (Okla. 1985), when the state has fraudulently concealed key facts pertaining to responsibility, no amount of diligence could have uncovered the key fact of the government's own admission of responsibility.

In light of the government's official concealment, I find the following discussion of our equitable duty compelling as "a sound and philosophical view of the principles of the statutes of limitation." Bailey v. Glover, 88 U.S. 342, 349 (1875).

> They were enacted to prevent frauds; to prevent parties from asserting rights after the lapse of time had destroyed or impaired the evidence which would show that such rights never existed, or had been satisfied, transferred, or extinguished, if they ever did exist. To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure.

Id. We may, in our discretion, when confronted by questions of equity, decide on the application of equitable tolling within the broad valley of doing justice, not the narrow canyon of legal rule. Under the circumstances of this case, no inquiry could have discovered the critical facts of the state's own admission of responsibility, and therefore inquiry was precluded until the publication of the Report in 2001. Because "[e]quity eschews mechanical rules" and requires us to exercise flexibility, "[e]quity will not lend

- 12 -

itself to such fraud and historically has relieved from it." Holmberg v. Armbrecht, 327

U.S. 392, 396 (1946); see also, TRW Inc. v. Andrews, 534 U.S. 19, 27 (2001).

Fraudulent concealment, like an assertion of exceptional circumstances, constitutes a

method of establishing equitable tolling, and the question of whether the Oklahoma

governments engaged in fraudulent concealment should have gone to the jury. See, e.g.,

Hobson, 737 F.2d at 37. Accordingly, the panel inadequately addressed the issue of

whether fraudulent concealment forecloses defendants' time bar defense.

It would be a perversion of equity at this stage to reward concealment recognized

by the Oklahoma Legislature as "a 'conspiracy of silence' [that] served the dominant

interests of the state," Okla. Stat. tit. 74, § 8000.1, merely because the plaintiffs were all

too aware of the general cause of their injury, even though the details remained hidden

and unacknowledged. I would not so easily conclude, as does the panel, that merely

because plaintiffs were able to file over one hundred lawsuits in the aftermath of the

atrocity (all of which were frustrated by courts' complicity in the concealment), that the

city and state should be given the benefit of their concealment and allowed to raise the

defense of the statute of limitations. This is particularly so in view of the district court's,

and the panel's own, determination that the original lawsuits were fruitless. Indeed, Scott

Ellsworth's The Tulsa Race Riot, attached to the Report, ends with the following: "In the

1920's Oklahoma courtrooms and halls of government, there would be no day of

reckoning for either the perpetrators or the victims of the Tulsa race riot. Now, some

- 13 -

seventy-nine years later, the aged riot survivors can only wonder if, indeed, that day will ever come." "Report" at 89. That wonder is over, and I am sad to say that before our court, that day will never come.

In summary, plaintiffs seek the one thing they could not get in 1921: a court to hear their claims free of official denial of culpability. Because the governments officially denied their guilt for the Riot and instead employed their judicial powers officially to condemn the African-American community for the tragedy, the district court properly concluded that equity demands tolling the statute of limitations. The district court's dismissal of plaintiffs' claim that those exceptional circumstances merited tolling the statute until the publication of the Commission Report should be revisited. Because the panel erred by affirming that conclusion and by applying an inappropriate legal standard to decide plaintiffs' fraudulent concealment claims, this matter deserves en banc consideration.

Accordingly, I **DISSENT** from the court's denial of en banc review. I am authorized to state that Judge Seymour joins me in this dissent.